# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Carlos Sanchez,

        Plaintiff,

v.

Civ. No. 08-5997 (RHK/FLN)
**MEMORANDUM OPINION AND ORDER**

Northwest Airlines, Inc., aka NWA, a
domestic corporation, and its parent
corporation Delta Air Lines, Inc., a foreign
corporation doing business in Minnesota,

        Defendants.

---

Dorene R. Sarnoski, Dorene R. Sarnoski Law Office, Minneapolis, Minnesota, for Plaintiff.

Timothy R. Thornton, Molly Borg Thornton, Briggs and Morgan, P.A., Minneapolis, Minnesota, for Defendants.

---

## INTRODUCTION

Plaintiff Carlos Sanchez has sued his employer, Northwest Airlines, Inc. ("Northwest"), alleging that it regarded him as disabled in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*[1] The parties now cross-move for summary judgment. For the reasons that follow, the Court concludes that Sanchez's

---

[1] Delta Air Lines, Inc. ("Delta"), Northwest's parent, also is named as a Defendant, but there are no substantive allegations in the Complaint against Delta – indeed, the alleged discrimination pre-dates Delta's merger with Northwest. Since it appears that Delta has been sued merely because Northwest is its subsidiary, the Court refers to the Defendants as "Northwest."

claim was discharged in bankruptcy. Accordingly, Northwest's Motion will be granted and Sanchez's Motion will be denied.

**BACKGROUND**

Although the factual background in this case is extensive, the Court recites below only those facts germane to the bankruptcy issue and which are either undisputed or viewed in the light most favorable to Sanchez. See Carrington v. City of Des Moines, Ia., 481 F.3d 1046, 1050-51 (8th Cir. 2007).

Sanchez, who lives in Hawaii, was hired by Northwest in 1990. Beginning in 1994, he worked as an Equipment Service Employee ("ESE"), splitting his time between Honolulu and Minneapolis. ESE duties include, among other things, handling and moving cargo/baggage. These duties are performed either in a baggage room in an airport building or on the tarmac, sometimes in airplane cargo/baggage bins themselves.

In June 2001, while working as an ESE in Honolulu, Sanchez injured his knee, requiring multiple surgeries, culminating in a total knee replacement in August 2002. He returned to work in a "light-duty" capacity later that year. In April 2003, he underwent a functional capacity evaluation to assess his ability to return to full-duty work. The evaluation determined that he could return to full-duty with several restrictions, including no squatting, climbing, or lifting more than 75 pounds. As a result, he was assigned ESE bag-room duties, not tarmac duties.

In January 2007, a Lead ESE position opened in Honolulu. Lead ESEs direct the work of other ESEs and, from time to time, also perform ESE duties. Sanchez bid for the

position in accordance with the terms of his collective-bargaining agreement,[2] and he was awarded the position. Shortly thereafter, Northwest performed an accommodation assessment to determine whether Sanchez could perform the job with his previously documented medical restrictions. According to Sanchez, no accommodation was required for the Lead ESE position and, in fact, he informed Northwest that he could perform all of the essential functions of the job. He objected to Northwest's reliance on the four-year-old functional capacity evaluation and sought to submit additional medical records indicating that he no longer had any medical issues at that time.

Although Northwest considered undertaking a new functional capacity evaluation, it opted not to do so. Ultimately, it revoked its Lead ESE offer on March 30, 2007, concluding that it could not accommodate Sanchez's previously noted work restrictions in the position.

Pursuant to the collective-bargaining agreement, Sanchez filed a grievance, which was denied at the "first step" on April 25, 2007. He then contacted the EEOC, believing that Northwest had discriminated against him. Meanwhile, he continued to pursue his grievance, which was denied at the "second step" on May 16, 2007. The union closed his claim on June 6, 2007. Sanchez later filed a charge of discrimination with the EEOC; the exact date of the charge is unclear from the record, although Northwest's response is dated July 13, 2007. The EEOC issued a right-to-sue letter on August 15, 2008.

---

[2] Sanchez's employment with Northwest is governed by a collective-bargaining agreement between the airline and the International Association of Machinists and Aerospace Workers.

Of critical importance here, most of these events occurred while Northwest was in bankruptcy. On September 14, 2005, Northwest and its affiliates filed voluntary bankruptcy petitions under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Case"). The Bankruptcy Court set August 16, 2006, as the "bar date" for creditors to file proofs of claim in the Bankruptcy Case. Then, on May 18, 2007, the Bankruptcy Court issued an Order confirming Northwest's reorganization plan under Chapter 11, setting May 31, 2007, as the effective date of confirmation. On the plan's effective date, the Bankruptcy Court set July 30, 2007, as the deadline for filing "administrative expense claims" in the Bankruptcy Case.

Sanchez never filed a claim in the Bankruptcy Case. Rather, on November 13, 2008, he commenced the instant action, alleging that Northwest's decision to revoke the Lead ESE offer violated the ADA. In his Complaint, he seeks lost wages and benefits, compensatory damages, statutory damages, and attorneys' fees.[3]

Northwest answered the Complaint, asserting *inter alia* that Sanchez's claim was barred because it was discharged in the Bankruptcy Case. Following discovery, the parties cross-moved for summary judgment. Because the bankruptcy issue was not

---

[3] In November 2008, shortly before commencing the instant action, Sanchez once again bid for a Lead ESE position in Honolulu. He was awarded the position in February 2009 and apparently continues to hold it today.

fleshed out in great detail in the parties' briefs, the Court ordered supplemental briefing on that issue. The matter is now ripe for disposition.[4]

## STANDARD OF DECISION

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that the material facts in the case are undisputed. E.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Carrington, 481 F.3d at 1050-51. The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. E.g., id. at 1050; Aviation Charter, Inc. v. Aviation Research Group/US, 416 F.3d 864, 868 (8th Cir. 2005). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. E.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

Where, as here, the Court confronts cross-motions for summary judgment, this approach is only slightly modified. When considering the defendant's motion, the Court views the record in the light most favorable to the plaintiff, and when considering the plaintiff's motion, the Court views the record in the light most favorable to the defendant. Int'l Bhd. of Elec. Workers, Local 176 v. Balmoral Racing Club, Inc., 293 F.3d 402, 404

---

[4] When the Court ordered supplemental briefing, it canceled oral argument on the parties' cross-Motions. Having reviewed the parties' submissions, the Court concludes that oral argument would not materially assist its resolution of the cross-Motions.

(7th Cir. 2002). "Either way, summary judgment is proper if the record demonstrates that there is no genuine issue as to any material fact." Id.

## ANALYSIS

The purpose behind reorganization under the Bankruptcy Code[5] is to afford the debtor a "fresh start," free from "the pressure and discouragement of preexisting debt." Grogan v. Garner, 498 U.S. 279, 286 (1991). For this reason, the Code makes clear that an order confirming a debtor's bankruptcy plan "discharges [all] debts arising prior to the date of confirmation." McSherry v. Trans World Airlines, Inc., 81 F.3d 739, 740 (8th Cir. 1996) (citing 11 U.S.C. § 1141(d)); accord, e.g., Tam Travel, Inc. v. Delta Airlines, Inc. (In re Travel Agent Comm'n Antitrust Litig.), 583 F.3d 896, 901 (6th Cir. 2009) ("By operation of the Bankruptcy Code, confirmation of a reorganization plan 'discharges the debtor from any debt that arose before the date of . . . confirmation.'") (citation omitted).[6] "Debt" is defined in the Code as "liability on a claim." 11 U.S.C. § 101(12). And a "claim," in turn, is defined as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." Id. § 101(5)(A). Because the Code's definition of "claim" casts such a wide net, see Johnson

---

[5] The Bankruptcy Code is Title 11 of the United States Code. Miller v. United States *ex rel.* Farmers Home Admin., 907 F.2d 80, 81 (8th Cir. 1990).

[6] Matters expressly excepted from discharge under a debtor's reorganization plan are, of course, not discharged by the plan's confirmation. See 11 U.S.C. § 1141(d)(1). Sanchez nowhere argues that his claim was expressly excepted in the Plan, which by its terms applies to all "debts and Claims, of any kind, nature or description whatsoever against [Northwest] to the fullest extent permitted by section 1141 of the Bankruptcy Code." (Thornton Aff. Ex. W ¶ 29.)

6

v. Home State Bank, 501 U.S. 78, 83 (1991), a confirmation order sweeps broadly in discharging claims against the debtor. See, e.g., Otto v. Tex. Tamale Co. (In re Tex. Tamale Co.), 219 B.R. 732, 737 (Bankr. S.D. Tex. 1998) ("The magnitude and breadth of this discharge must be emphasized.").

The question before the Court is whether Sanchez's ADA claim existed on the effective date of Northwest's confirmed reorganization plan, May 31, 2007. If it did, then the claim was discharged in the Bankruptcy Case and must be dismissed. Although Sanchez strenuously argues that he had no claim at the time of confirmation, the Court cannot agree.

**I.     Claim**

The crux of Sanchez's argument is that a "claim" turns on a right to payment and, on the date the plan was confirmed, he had no right to payment from Northwest. Instead, he was still grieving his dispute at that time, "fighting for an 'accommodation' so that he could keep the Lead ESE position." (Pl. Supp. Mem. at 3-4.) In Sanchez's view, his "right to payment" from Northwest accrued only after his "second step" grievance was denied and the union closed his file on June 6, 2007 – had Northwest returned him to the Lead ESE job prior to that time, "no damages would have been incurred." (Id. at 4.)

The problem with this argument is that it overlooks the broad definition of the term "claim." Under that definition, a creditor has a "claim" against a debtor even where his "right to payment" is "unliquidated, . . . contingent, . . . unmatured, [or] disputed." 11 U.S.C. § 101(5)(A). Hence, the fact that Sanchez's "claim" was contingent on being unsuccessful in his grievance in no way exempts it from the statutory definition – instead,

it places it squarely within its reach. Only by construing the term "claim" broadly enough to encompass allegations like Sanchez's can it be assured that "all legal obligations of the debtor, *no matter how remote or contingent*, will be able to be dealt with in the bankruptcy case." Siegel v. Fed. Home Loan Mortgage Corp., 143 F.3d 525, 532 (9th Cir. 1998) (emphasis added); accord, e.g., Kresmery v. Serv. Am. Corp., 227 B.R. 10, 13 (D. Conn. 1998) ("[A] 'claim' for bankruptcy purposes may arise before such a claim would be cognizable in a nonbankruptcy context.").

Northwest relies heavily on McSherry to support its argument in favor of discharge, and the Court finds that case instructive. There, McSherry asserted that his employer had discriminated against him after it had filed for bankruptcy. He filed an ADA discrimination charge with the EEOC, but before the charge was resolved, the bankruptcy court entered an order confirming the employer's reorganization plan. The EEOC then issued a right-to-sue letter, and McSherry subsequently commenced an ADA action in federal court, which was dismissed based on the bankruptcy-discharge bar. On appeal, McSherry argued that he had no "claim" at the time the employer's plan was confirmed because he had not received a right-to-sue letter at that time, a jurisdictional prerequisite to suit under the ADA. The Eighth Circuit rejected that argument, stating:

> It is clear that the definition of "claim," as stated in the [Bankruptcy] Code, is broad enough to encompass an obligation on which a civil action would be premature because jurisdictional prerequisites have not been met. Both the allegedly unlawful actions and the harm occurred on the date of termination, and McSherry's right to redress that wrong existed on that date. While lack of a right to sue letter may have left his claim unmatured or contingent on that date, § 105(A) specifically includes such claims within its definition.

Id. at 740; accord, e.g., Kresmery, 227 B.R. at 14. The same is true here. Northwest's allegedly "unlawful" action, and the harm supposedly caused by it, occurred on the date it rescinded the Lead ESE offer: March 30, 2007. Hence, Sanchez had a "claim" as of that date, and the Bankruptcy Court's subsequent confirmation of the reorganization plan discharged that claim. 11 U.S.C. § 1141(d)(1)(A).[7]

Sanchez cites United States Commodity Futures Trading Commission v. NRG Energy, Inc., 457 F.3d 776 (8th Cir. 2006), to argue that his claim was not discharged, but his reliance on NRG Energy is misplaced. There, the Eighth Circuit held that a CFTC enforcement action was not barred by confirmation of the defendant's bankruptcy plan because the CFTC merely sought injunctive relief preventing *future* violations of the Commodity Futures Act, rather than damages for pre-discharge conduct. Id. at 780-81. Sanchez tries to shoehorn his case into NRG Energy's holding, asserting that he was attempting to obtain "injunctive relief" – the "return" of the Lead ESE position – through his grievance. (Pl. Supp. Mem. at 5.) But this argument ignores the nature of the relief he seeks in *this case*. Whatever he was hoping to accomplish through the grievance process, the Complaint here only seeks damages stemming from Northwest's alleged ADA violation. Because that "violation" (and the concomitant right to damages) occurred before the bankruptcy plan was confirmed, the claim has been discharged by operation of the Bankruptcy Code.

---

[7] It makes no difference that the alleged discrimination occurred after the Bankruptcy Case was filed, because "[a]s a general rule, post-petition/pre-confirmation claims are discharged as part of bankruptcy reorganization." Wright v. Centennial Healthcare Corp., 383 B.R. 355, 357-58 (D.D.C. 2008) (citations omitted). The question is whether Sanchez had a claim before the effective date of the plan's confirmation, regardless of whether it arose pre- or post-petition.

Sanchez also argues that his claim survives (even if only in part) because Northwest violated the ADA *after* confirmation by not re-offering him the Lead ESE position, labeling Northwest's post-confirmation conduct as a "continuing violation" of the ADA. (Pl. Supp. Mem. at 6.) It is true that claims for discrimination occurring post-confirmation are not barred by a bankruptcy discharge. But Northwest's failure to re-offer the position is neither post-confirmation discrimination nor a "continuing violation," which is an "unlawful employment practice that manifests itself over time, instead of through a series of discrete acts." Nuetzman v. Con-Way Transp. Servs., Inc., Civ. No. 06-2730, 2007 WL 2908112, at *6 (D. Minn. Oct. 1, 2007) (Magnuson, J.) (citation omitted). Here, the allegedly discriminatory conduct was *one* discrete act: Northwest's revocation of the Lead ESE position. Its later refusal to remedy that "discrimination" was not a separately actionable discriminatory act. As one court has stated, "[a]n employer's refusal to undo a discriminatory decision is not a fresh act of discrimination." Martin v. Sw. Va. Gas Co., 135 F.3d 307, 310 (4th Cir. 1998) (quoting Graehling v. Village of Lombard, Ill., 58 F.3d 295, 297 (7th Cir. 1995)); accord, e.g., Stewart v. Booker T. Washington Ins., 232 F.3d 844, 853 (11th Cir. 2000) ("Where an employer . . . refuses to rectify the past violation[,] [there] is not a continuing violation."); Conner v. Reckitt & Colman, Inc., 84 F.3d 1100, 1102 (8th Cir. 1996).[8]

---

[8] Indeed, under Sanchez's logic *all* discriminatory acts would be continuing violations as long as the employer did not take remedial action. What Sanchez really challenges is the post-confirmation *effect* of Northwest's pre-confirmation conduct, but a "plaintiff cannot assert a continuing violation based on isolated instances of discrimination in the past, even if effects of the discrimination continue into the present." Nuetzman, 2007 WL 2908112, at *6; see also Holcombe v. US Airways, Inc., No. 08-1506, 2010 WL 750086, at *4 & n.2 (4th Cir. Mar. 5,

For these reasons, the Court concludes that Sanchez had an ADA "claim" on the effective date of Northwest's bankruptcy plan. Because confirmation discharged the claim, it is now barred. 11 U.S.C. § 1141(d)(1)(A); McSherry, 81 F.3d at 740.

**II.     Due process**

Sanchez next argues that even if he had an ADA claim on the confirmation date, it is not barred by the bankruptcy discharge because he received inadequate notice in the Bankruptcy Case. (Pl. Supp. Mem. at 7-9.) It is well-settled that the Due-Process Clause of the Fifth Amendment protects a bankruptcy creditor from the discharge of his claim without adequate notice. E.g., United States ex rel. Internal Revenue Serv. v. Hairopoulos (In re Hairopoulos), 118 F.3d 1240, 1244-45 (8th Cir. 1997); Reliable Elec. Co. v. Olson Constr. Co., 726 F.2d 620, 623 (10th Cir. 1984); United States v. State Street Bank & Trust Co., 303 B.R. 35, 40-41 (Bankr. D. Del. 2003). Creditors "have a right to adequate notice and the opportunity to participate in a meaningful way in the course of bankruptcy proceedings." In re Hairopoulos, 118 F.3d at 1244. The sufficiency and adequacy of notice to a creditor must be evaluated on a case-by-case basis, "with due regard for the practicalities and peculiarities of the case." Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314-15 (1950); accord, e.g., Jones v. Flowers, 547 U.S. 220, 227 (2006). Constitutionally sufficient notice is that which is "reasonably calculated, under all the circumstances, to apprise interested parties of the

---

2010) (rejecting "continuing violation" for effects of pre-confirmation conduct persisting into post-confirmation period); Kresmery, 227 B.R. at 16 (same).

pendency of the action and afford them an opportunity to present their [claims]." Mullane, 339 U.S. at 314.

Based on the record before it, the Court discerns no due-process concerns here. The evidence clearly shows that Sanchez was mailed notices regarding the bar dates for filing claims. He does not dispute that he received those notices, and he nowhere contends that they were mailed to an improper address. In fact, he acknowledges that he received various items of correspondence in connection with the Bankruptcy Case. Generally speaking, notice sent by mail – without any indication that it was not received by the addressee – is constitutionally sufficient. See Jones, 547 U.S. at 226; Mennonite Bd. of Missions v. Adams, 462 U.S. 791, 799-800 (1983). This rule would appear particularly apt in bankruptcy cases, which often involve thousands of creditors, making other forms of notice (such as personal service or certified mail) impractical or unduly expensive. See, e.g., Mullane, 339 U.S. at 318-19 (due process does not require notice that, "by reasons of delay if not expense," would "seriously interfere with the proper administration of" a case).

The Court's inquiry does not end here, however, because Sanchez also argues that the notices sent in the Bankruptcy Case were insufficient. Yet, he predicates this argument on a flawed assertion: that he was mailed only *one* notice from Northwest, namely, the 2006 notice informing him of the deadline for submitting proofs of claim. He argues that he cannot have been required to file a claim in response to that notice, which was sent long before his ADA claim accrued in 2007. (See Pl. Supp. Mem. at 7-9.) That is no doubt true – it would violate due process to have required Sanchez to file a

12

proof of claim *before* Northwest revoked the Lead ESE offer. Mullane, 339 U.S. at 314 (due process requires advance notice to "afford a reasonable time for those interested to make their appearance" and "present their objections").

But as Northwest points out, Sanchez also was mailed a notice on or about May 31, 2007 – *after* his ADA claim had accrued – setting a bar date for "administrative expense claims."[9] Although dense with legalese, that notice informed "all creditors, equity interest holders and parties in interest" of the obligation to file claims on or before July 30, 2007, for "any right to payment" for "any indebtedness or obligations incurred by [Northwest] during the" Bankruptcy Case. (Thornton Aff. Ex. U.) While perhaps not as explicit as it could have been,[10] in the Court's view this notice was sufficient to inform Sanchez that he needed to act in the Bankruptcy Case, lest his ADA claim be forever barred, and it provided him ample opportunity to do so. His failure to file a claim cannot be excused now under the guise of "due process." See Ramos v. Compton (In re

---

[9] The Bankruptcy Code permits the payment of "administrative expenses," which (generally speaking) are costs incurred in preserving assets of the debtor's estate. See 11 U.S.C. § 503(a)-(b). Such expenses include "wages and benefits [for] back pay attributable to any period of time occurring after [the bankruptcy petition] as a result of a violation of Federal or State law by the debtor." Id. § 503(b)(1)(A)(ii). In other words, "discrimination claims that arise post-petition but pre-confirmation [are] administrative expenses against the debtor's estate." ZiLOG, Inc. v. Corning (In re ZiLOG, Inc.), 450 F.3d 996, 999 n.1 (9th Cir. 2006); accord, e.g., In re UAL Corp., 386 B.R. 701, 707 (Bankr. N.D. Ill. 2008) ("[T]o the extent that United engaged in . . . discriminati[on] against Nazir during the administration of its estate in bankruptcy, Nazir had a right to payment of an administrative expense for his resulting damages."), reversed in part on other grounds, 398 B.R. 243 (N.D. Ill. 2008).

[10] See, e.g., Gonzalez-Ruiz v. Doral Fin. Corp. (In re Gonzalez-Ruiz), 341 B.R. 371, 381 (1st Cir. BAP 2006) ("Notice does not need to be perfect; it must only be reasonable based upon the circumstances of the case."); In re Wright, 300 B.R. 453, 461 (Bankr. N.D. Ill. 2003) (same); see also Kornblum v. St. Louis County, Mo., 72 F.3d 661, 666 (8th Cir. 1995) (*en banc*) (Hansen, Gibson, Fagg, Wollman & Murphy, JJ., dissenting) (same).

Compton), 891 F.2d 1180, 1187 (5th Cir. 1990) (creditor cannot "stand[] back, allowing the bankruptcy action to proceed without adjudication of his claim, and then assert[] that the debt owed him is undischargeable"); Wiler v. Meridian Auto. Sys., Inc., No. 1:08-CV-21, 2008 WL 4682435, at *2-3 (W.D. Mich. Oct. 21, 2008) (post-petition/pre-confirmation age-discrimination claim barred where employee failed to submit claim by administrative-expense deadline).

Sanchez also points out that the administrative-expense notice expressly carved out claims "accruing post petition under an assumed collective bargaining agreement or imposed terms, whether ordinary course claims or grievances." (Pl. Supp. Mem. at 2 (quoting Thornton Aff. Ex. U).) Yet, he stops short of arguing that his claim falls within this exception and, hence, escapes the administrative-expense deadline. Regardless, the claim asserted here does not arise "under [a] collective bargaining agreement." Rather, it is a statutory claim, for violation of the ADA. See Holcombe, 2010 WL 750086, at *4 n.3 (noting distinction between statutory claims and claims under a collective-bargaining agreement for discharge bar purposes).[11]

For these reasons, holding Sanchez's claim barred by the bankruptcy discharge does not run afoul of due process.

---

[11] Sanchez also cites several cases discussing when a bankruptcy court may consider a dilatory claim under Federal Rule of Bankruptcy Procedure 9006. (Pl. Supp. Mem. at 8.) Those cases are inapposite, as the issue here is whether the discharge of Sanchez's claim is consistent with due process.

## III. Equity

Lastly, Sanchez argues that it would be inequitable to allow Northwest to rely on the discharge bar when it "fail[ed] to disclose that it had relevant, responsive documents" concerning the same. (Pl. Supp. Mem. at 9.) He claims that he served Interrogatories asking Northwest to identify the documents supporting its defenses and it responded, "None." (Id. at 10.) Northwest supplemented this response on the last day of the discovery period, pointing to the notices and other documents filed in the Bankruptcy Case that it now cites in support of the discharge bar. Sanchez argues that the Court should decline to apply the bar as a result of this "legal ambush." (Id.)

The Court rejects this argument for several reasons. First, Northwest's assertion that Sanchez's claim was barred by the bankruptcy discharge has been well known since this case's inception. Indeed, Northwest raised the bar as a defense in its Answer, and the issue came up in discovery, including during Sanchez's deposition. Second, the documents pointed to in Northwest's supplemental response were all publicly available. Third, as noted above, Sanchez has never disputed that he received various documents during the course of the Bankruptcy Case, including the bar-date notices. Fourth, Sanchez contends that he was prejudiced by Northwest's belated disclosure because he could not "follow-up on the time-consuming task of investigating the bankruptcy disclosures further" (Pl. Supp. Mem. at 10), but he nowhere explains what additional discovery he would have sought, nor is any apparent to the Court.[12] Regardless, he could

---

[12] Indeed, courts often resolve whether a claim has been discharged in bankruptcy under Federal Rule of Civil Procedure 12(b)(6), *i.e.*, without discovery. See, e.g., Long v. Delta Air Lines,

15

have moved for additional time and/or for further discovery to address the bankruptcy issue, see Fed. R. Civ. P. 56(f), but he failed to do so.

While the Court believes Northwest should have earlier identified the documents it now cites to support its bankruptcy-discharge defense, such belated identification does not warrant striking this defense as a sanction. See Fed. R. Civ. P. 37(c) (court may, *inter alia*, strike defense of party that fails to supplement discovery response, "unless the failure was substantially justified or is harmless").

## CONCLUSION

For the reasons set forth above, the Court concludes that Sanchez's ADA claim was discharged in the Bankruptcy Case and, accordingly, he is barred from asserting it now. 11 U.S.C. § 1141(d)(1)(A). Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Sanchez's Motion for Summary Judgment (Doc. No. 20) is **DENIED**, Defendants' Motion for Summary Judgment (Doc. No. 17) is **GRANTED**, and Sanchez's Complaint (Doc. No. 1) is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Date: May 21, 2010

s/Richard H. Kyle
RICHARD H. KYLE
United States District Judge

---

Inc., No. 5:08-CV-210, 2009 WL 5198092 (W.D. Ky. Dec. 23, 2009); Conroy v. Delta Air Lines, Inc., No. 07-61890-Civ., 2008 WL 1994830 (S.D. Fla. May 8, 2008); Carter v. Safety-Kleen Corp., No. 06 Civ. 12947, 2007 WL 1180581 (S.D.N.Y. Mar. 14, 2007).