UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| CARLOS SANCHEZ, | Case No. 08-CV-5997 (PJS/FLN) |
| Plaintiff, | |
| v. | ORDER |
| NORTHWEST AIRLINES, INC., a domestic corporation; and DELTA AIR LINES, INC., a foreign corporation doing business in Minnesota, | |
| Defendants. | |

Dorene R. Sarnoski, DORENE R. SARNOSKI LAW OFFICE, for plaintiff.

Timothy R. Thornton, Britt M. Gilbertson, BRIGGS & MORGAN, P.A., for defendants.

Plaintiff Carlos Sanchez sued his employer, defendant Northwest Airlines, Inc. ("Northwest"),[1] under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., alleging that Northwest discriminated against him on the basis of disability when it denied him a promotion. This matter is before the Court on Northwest's motion for summary judgment. For the reasons stated below, the motion is granted.

I. BACKGROUND

Sanchez began working for Northwest in December 1990 as a customer-service agent. Sanchez Dep. 10; Sanchez Aff. ¶ 4. In 1994, Sanchez became an equipment-service employee ("ESE"), and, except for a two-week stint spent retraining as a customer-service agent in 2005,

---

[1] Sanchez has also sued Northwest's corporate successor, Delta Air Lines, Inc. For the sake of simplicity, the two airlines will be referred to collectively as "Northwest."

Sanchez has worked as an ESE since 1994. Sanchez Dep. 10, 50-52; Gilbertson Aff. Feb. 6, 2012 [Docket No. 73] [hereinafter "Gilbertson Aff."] Ex. H at 2.

Sanchez lives in Hawaii, and thus, to the extent possible, he has worked at the Honolulu International Airport. But when periodic layoffs or seasonal fluctuations in air traffic have left him without work in Honolulu, Sanchez has used his seniority to bid into ESE jobs at the Minneapolis/St. Paul International Airport. Sanchez Dep. 19-20, 40-43, 45. Because Honolulu is his permanent home station, however, Sanchez has the right to be recalled to Honolulu whenever there is sufficient work for him there. Sanchez Dep. 40.

ESEs perform a variety of functions, including handling mail, freight, cargo, and baggage; cleaning, washing, and polishing the interior and exterior of aircraft; driving fuel trucks and operating fuel-storage facilities; and performing other types of maintenance and repair. Sarnoski Aff. Apr. 15, 2010 [Docket No. 26] [hereinafter "Sarnoski Aff."] Ex. B. Critical to this case, ESEs sort baggage in what is known as the "bag room" and load baggage onto and take baggage off of aircraft. Lambert Dep. 66; Sanchez Dep. 27, 35. The specific duties of an ESE vary somewhat by airport and by shift, in part because, at some airports, ESEs are able to bid to be assigned exclusively to particular tasks, such as working in the bag room. Sanchez Dep. 27, 41; Lambert Dep. 58-59.

In June 2001, Sanchez fell and injured his knee while working. Sanchez Dep. 15-16. After his knee failed to improve, Sanchez consulted a surgeon, Dr. Oishi. Sanchez Dep. 16-17. Dr. Oishi performed a complete knee replacement on Sanchez in August 2002. Sanchez Dep. 17-18. After the surgery, Sanchez was on leave until November 2002, when he returned to light duty. Sanchez Dep. 21.

Sanchez filed a worker's-compensation claim for his knee injury, as a result of which he underwent a "Functional Capacity Evaluation" ("FCE") in April 2003. Sanchez Dep. 15, 17, 21-22. The FCE details various lifting restrictions and notes that Sanchez cannot squat, crawl, climb ladders, or perform "fine hand" functions. Gilbertson Aff. Ex. D at 551-53. Dr. Oishi signed the FCE and added that Sanchez was permanently restricted from lifting more than 75 pounds. Gilbertson Aff. Ex. D at 551, 555; Sanchez Dep. 25-26. With those restrictions, Dr. Oishi released Sanchez to return to work. Gilbertson Aff. Ex. D at 555; Sanchez Dep. 26.

After Northwest received Sanchez's FCE, it initiated an "accommodation assessment." Etienne Dep. 18-19; Gilbertson Aff. Ex. G at 1. An accommodation assessment is a formal process conducted by Northwest's accommodations department. Fredrikson Dep. 30. Typically, once an employee is referred for an accommodation assessment, an accommodations specialist notifies the employee about the process. Fredrikson Dep. 30. The specialist gathers medical information regarding the employee's restrictions and conducts an interactive group discussion, which usually involves the employee, a union representative, the employee's manager, and possibly others. Fredrikson Dep. 30-31. The participants review the employee's medical restrictions and essential job functions and discuss potential accommodations. Fredrikson Dep. 31-32.

During Sanchez's accommodations assessment in 2003, Dr. Oishi modified Sanchez's restrictions somewhat in response to a query from Northwest. Specifically, Dr. Oishi said that Sanchez could crawl two to three days per month as necessary to clear bag jams in the bag room. Sarnoski Aff. Ex. C-3. At the conclusion of the 2003 assessment, Northwest granted Sanchez a

minor accommodation, permitting him to replace squatting with one-knee kneeling. Gilbertson Aff. Ex. G at 2.

Over the years, as Sanchez was transferred back and forth between Honolulu and Minneapolis, Northwest conducted additional accommodation assessments. Gilbertson Aff. Exs. H-I. There is no evidence that Sanchez requested these assessments; rather, the evidence indicates that Northwest conducted them on its own initiative. Sanchez Aff. ¶ 8. As a result of these assessments, Northwest granted a couple of other accommodations to Sanchez: In June 2005, when Sanchez was working as an ESE in Honolulu, Northwest excused him from loading and unloading baggage inside the bins of narrow-body aircraft. Gilbertson Aff. Ex. H at 4. And in 2006, Northwest offered Sanchez a temporary medical leave of absence until he could successfully bid into an assignment in the bag room at the Minneapolis airport. Gilbertson Aff. Ex. I.

Northwest contends that it also accommodated Sanchez by permitting him to work full-time in the bag room (avoiding the need to work on the ramp). *See* ECF No. 72 at 6 ("During this four-year period, Sanchez never questioned the work restrictions or the resulting relief that enabled him to stay off the ramp."). But the formal accommodation letters that Northwest issued to Sanchez over the years do not list bag-room work as an accommodation. *See* Gilbertson Aff. Exs. G at 2, H at 4, I. Instead, it appears that Sanchez was able to work in bag-room-only positions through a combination of exercising his seniority to bid on such positions and making informal requests to his managers or co-workers to let him work in the bag room. *See* Sanchez Dep. 34-35, 44, 58, 121; Gilbertson Aff. Ex. G at 2 ("Mr. Sanchez will utilize his seniority to hold the bid line of Bag Room in MSP."); *id.* Ex. I ("On November 24, 2006, you were awarded

a local preference bid for an assignment in the bag room . . . ."). That Sanchez's managers and co-workers apparently had no objection to these informal requests is understandable in light of the fact that, as Sanchez testified, not many ESEs like being assigned to the bag room — because the bag room, unlike the ramp, is constantly busy. Sanchez Dep. 37-38, 58, 121.

In January 2007, Sanchez bid for and was awarded the Lead ESE position in Honolulu. Sarnoski Aff. Ex. E; Sanchez Dep. 94. A Lead ESE is responsible for assigning, leading, and directing the work of the ESEs and performing equipment-service work as required. Sarnoski Aff. Ex. B. Both Northwest and Sanchez agree that a Lead ESE must be able to perform all of the functions of an ESE. Sanchez Dep. 89. As described above, Sanchez had been excused from performing some of those functions — in particular, loading and unloading baggage inside the bins of narrow-body aircraft. But Sanchez testified that, as a practical matter, Lead ESEs rarely work inside the bins of such aircraft. Sanchez Dep. 89-90; *see also* Sanchez Dep. 126-27 (Sanchez estimating that he has been in a narrow-body aircraft three times in his current job as Lead ESE).

After awarding Sanchez the Lead ESE position, Northwest initiated another accommodation assessment. Gilbertson Aff. Ex. K. Greg Lambert, the accommodations specialist assigned to conduct the assessment, held an interactive group discussion about Sanchez's accommodation needs on February 6, 2007. Gilbertson Aff. Ex. L. In the e-mail notification for the group discussion, Lambert listed Sanchez's work restrictions as follows:

- Lifting from floor using back: 100 lbs occasional, 50 lbs frequent, 20 lbs constant

- Lifting from floor using legs (starting from a squatting position): None

- Lifting to shoulder height: 70 lbs occasional; 35 lbs frequent; 14 lbs constant

- Lifting overhead: 60 lbs occasional; 30 lbs frequent; 12 lbs constant

- Push/pull: 75 lbs occasional; 38 lbs frequent, 15 lbs constant

- Bending, kneeling, forward reaching, overhead reaching: frequent

- Stair climbing: occasional

- Squatting, ladder climbing, crawling: none

Gilbertson Aff. Ex. L. Lambert derived these restrictions from Sanchez's April 2003 FCE. Lambert Dep. 110-12.

During the February 6 discussion, Sanchez told Lambert that he was capable of performing the job of Lead ESE and that he could work inside the bins of aircraft as necessary, although not every day. Sanchez Dep. 97, 104. Sanchez also suggested that Northwest could accommodate him by not requiring him to work inside the bins. Gilbertson Aff. Ex. N; Sanchez Dep. 103-04. Sanchez explained that unloading an airplane requires two people and that, as the lead, he could simply assign an ESE to work in the bin while he worked outside the airplane. Sanchez Dep. 103-04. Finally, Sanchez asked Lambert if he should get updated medical information; Sanchez specifically offered to get a doctor's note stating that he could do all of the job requirements. Lambert told Sanchez that it wasn't necessary because Lambert had all of the information that he needed. Sanchez Dep. 98-99, 102; Lambert Dep. 122, 134-35.

After the February 6 discussion, Lambert continued to gather information about the Lead ESE position and the impact of Sanchez's restrictions on his ability to perform the duties of the position. As part of this effort, Lambert flew to Honolulu to observe the work done by the Lead

ESEs and to interview employees about that work. Lambert Dep. 118-19, 167. Lambert also recommended that Sanchez undergo a fitness-for-duty exam paid for by Northwest. Lambert Dep. 135-36, 148-49. Anna Metcalfe, Northwest's director of ground operations at the Honolulu airport, *see* Lambert Dep. 97, approved payment for such an exam, but Lambert's supervisor apparently decided not to follow that recommendation for reasons that are unclear, Lambert Dep. 137-38, 148-50. Similarly, Lambert inquired about having Northwest's insurer pay for another FCE,[2] but, on the advice of the insurer, Northwest ultimately decided not to pursue an updated FCE, apparently out of fear that it might restart the statute of limitations on Sanchez's worker's-compensation claim. Etienne Dep. 30-31, 41-44; Lambert Dep. 142-43.

In a February 27 e-mail to his supervisor, Lambert reported that he had been told that Lead ESEs are sometimes required to work inside aircraft bins and that, if Sanchez were accommodated by being excused from doing that work, Northwest could experience delays in its operations at the Honolulu airport. Gilbertson Aff. Ex. M. In the same e-mail, Lambert also reported that Metcalfe (the director of ground operations at the Honolulu airport) expressed "a concern regarding [Sanchez's] mental health and [the] fact that he has been in an inpatient mental health treatment program." Gilbertson Aff. Ex. M.

After completing his investigation, Lambert recommended that Sanchez be medically disqualified from the Lead ESE position in Honolulu. Gilbertson Aff. Ex. J. Lambert based this recommendation on his conclusion that an essential function of the Lead ESE position in Honolulu was to load and unload baggage inside aircraft bins and his understanding that the

---

[2]A fitness-for-duty exam differs from an FCE in that the former is a physical exam by a doctor, while the latter is an evaluation of a person's functional capacity by a physical therapist, typically conducted over the course of several days. Lambert Dep. 34-35, 37, 135-36.

restrictions in Sanchez's 2003 FCE — and in particular the restrictions on squatting and crawling — would preclude Sanchez from performing this function. Gilbertson Aff. Ex. J; Lambert Dep. 106. On March 30, 2007, after discussing his recommendation with his supervisor and Northwest counsel, Lambert Dep. 119-20, Lambert informed Sanchez that Northwest would not accommodate Sanchez by excusing him from working inside the bins — and that Sanchez was therefore disqualified from the Lead ESE position, Gilbertson Ex. N.

After Northwest revoked the Lead ESE job offer, Sanchez submitted a letter from Dr. Oishi stating that Sanchez could perform all aspects of the job and that his only restrictions were running and lifting over 75 pounds. Gilbertson Aff. Ex. E. These were much different than the restrictions that Dr. Oishi had imposed in 2003, but Lambert refused to reconsider his decision. Instead, Lambert told Sanchez that he could bid for the next open position and that Northwest would consider Dr. Oishi's letter at that time. Sanchez Dep. 111-12; Lambert Dep. 158-60.

Sanchez grieved the denial of the Lead ESE position, Gilbertson Aff. Ex. O, and later filed a charge with the Equal Employment Opportunity Commission, Sanchez Dep. 135. After receiving his right-to-sue letter, Gilbertson Aff. Ex. Q, Sanchez brought this lawsuit. Shortly after he sued, Sanchez again bid on the Lead ESE position in Honolulu. This time he was awarded the position, and he continues to hold the position to this day. Sanchez Dep. 88, 121.

## II.  ANALYSIS

### A.  Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). A dispute over a fact is "material" only if its resolution might affect the outcome of the lawsuit under the substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

B. *Sanchez's Discrimination Claim*[3]

The ADA forbids employers to take adverse action against employees because of disability. 42 U.S.C. § 12112(a).[4] The parties agree that Sanchez's discrimination claim should be analyzed under the familiar three-step framework described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). To establish a prima facie case of disability discrimination under that framework, Sanchez must show that (1) he has a disability within the meaning of the

---

[3]On May 21, 2010, Judge Richard H. Kyle granted Northwest's motion for summary judgment on the ground that Sanchez's claim had been discharged in bankruptcy. *See Sanchez v. Nw. Airlines, Inc.*, 432 B.R. 803 (D. Minn. 2010). The United States Court of Appeals for the Eighth Circuit reversed and remanded. 659 F.3d 671 (8th Cir. 2011). Judge Kyle then recused, and the case was reassigned to the undersigned.

Neither Judge Kyle nor the Eighth Circuit addressed the merits of Sanchez's claim. Nevertheless, Sanchez contends that Northwest is somehow precluded, under the doctrine of res judicata, from moving for summary judgment on the merits. This argument is flawed on a number of levels, the first of which is that the application of res judicata requires a final judgment, *Costner v. URS Consultants, Inc.*, 153 F.3d 667, 673 (8th Cir. 1998), but there is no longer a final judgment in this case, as it was reversed on appeal, *see* ECF No. 59. *Cf. United States v. Maull*, 855 F.2d 514, 516 n.3 (8th Cir. 1988) (noting that a Rule 12(b)(6) dismissal is a judgment on the merits for res-judicata purposes unless the dismissal is reversed on appeal).

[4]On January 1, 2009, the ADA Amendments Act of 2008 ("ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553, took effect. Although Sanchez contends that the Court should consider the ADAAA when analyzing his claim, Sanchez concedes that the ADAAA is not retroactive. *See* ECF No. 76 at 20-21; *Nyrop v. Indep. Sch. Dist. No. 11*, 616 F.3d 728, 734 n.4 (8th Cir. 2010) (ADAAA is not retroactive). The Court therefore applies the pre-ADAAA version of the ADA as well as applicable pre-ADAAA case law.

ADA; (2) he was qualified to perform the essential functions of the Lead ESE position, with or without reasonable accommodation, and (3) he was denied a promotion to Lead ESE because of his disability. *Finan v. Good Earth Tools, Inc.*, 565 F.3d 1076, 1079 (8th Cir. 2009). Once Sanchez has made out a prima facie case, the burden shifts to Northwest to articulate a legitimate, nondiscriminatory reason for its action. *Kozisek v. County of Seward, Neb.*, 539 F.3d 930, 935 (8th Cir. 2008). If Northwest meets its burden, the onus then shifts back to Sanchez to show that Northwest's proffered reason is pretextual. *Id.*

Northwest argues that Sanchez has failed to establish any of the elements of his prima facie case and that he cannot show pretext. For the most part, the Court does not agree. A reasonable jury could find that Sanchez was qualified for the position of Lead ESE; indeed, given that Sanchez is currently performing that job satisfactorily, a reasonable jury would almost *have* to find that he was qualified. Moreover, if Sanchez could show that he was disabled within the meaning of the ADA, a reasonable jury could find that Northwest denied Sanchez the Lead ESE position because of his disability and that Northwest's proffered reason for the denial was pretextual. But the Court nevertheless grants summary judgment to Northwest because it agrees with Northwest that a reasonable jury cannot find that Sanchez is disabled within the meaning of the ADA.

An employee is disabled for purposes of the ADA if one of three things is true: (1) he is actually disabled — that is, he has a physical or mental impairment that substantially limits a major life activity; (2) he has a record of such an impairment; or (3) he is regarded as having such an impairment. 42 U.S.C. § 12102(1). Sanchez does not contend that he is actually disabled or

that he has a record of being disabled. Instead, Sanchez argues that Northwest *regarded* him as disabled.

In order to establish that Northwest regarded him as disabled, Sanchez must show either that (1) Northwest mistakenly believed that he had an impairment that substantially limited one or more major life activities, or (2) Northwest mistakenly believed that an actual, nonlimiting impairment substantially limited one or more major life activities. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999). Sanchez argues the latter — specifically, that Northwest mistakenly believed that Sanchez's knee injury substantially limited him in the major life activities of performing manual tasks and working.

"[T]o be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 198 (2002). Such activities include performing household chores and tending to personal hygiene. *Id.* at 201-02. To be substantially limited in the activity of working, an individual must show that his impairment prevents him from performing a broad class of jobs. *Sutton*, 527 U.S. at 491. In determining whether an individual is substantially limited in his ability to work, courts consider the geographical area to which the individual has reasonable access and the number and types of jobs within that geographical area that the individual cannot perform because of his impairment. *Id.* at 491-92.

For Sanchez to establish that Northwest regarded him as disabled, then, Sanchez must point to evidence that Northwest regarded him as having an impairment that either (1) prevented or severely restricted Sanchez from doing activities of central importance to daily life or

-11-

(2) prevented Sanchez from working a broad class of jobs. *Cf. Conant v. City of Hibbing*, 271 F.3d 782, 785 (8th Cir. 2001) (per curiam) ("being regarded as having a limiting but not disabling restriction . . . cannot be a disability within the meaning of the ADA"); *Weber v. Strippit, Inc.*, 186 F.3d 907, 915 (8th Cir. 1999) (test for whether employer regarded employee as disabled is whether employer "regarded him as having an impairment *that substantially limits one or more major life activities*").

Sanchez correctly argues that a reasonable jury could find that Northwest mistakenly believed that the restrictions placed on Sanchez as a result of the 2003 FCE were permanent. Thus, taking the evidence in the light most favorable to Sanchez, a reasonable jury could find that Northwest mistakenly regarded Sanchez as being unable to squat, crawl, climb ladders, run, lift more than 75 pounds, or perform "fine hand" work. But Sanchez points to no evidence that these perceived restrictions would have severely restricted his ability to perform tasks of central importance to daily life. It is true that a limitation on lifting together with limitations on other basic motor functions may create a triable issue of disability if those restrictions, in the aggregate, prevent or severely restrict the plaintiff from performing important manual tasks. *Breitkreutz v. Cambrex Charles City, Inc.*, 450 F.3d 780, 783-84 (8th Cir. 2006); *see also Nuzum v. Ozark Auto. Distribs., Inc.*, 432 F.3d 839, 845 (8th Cir. 2005) ("a substantial limitation of a constellation of such basic motor functions [as lifting] could suffice to prove disability"). But Sanchez unequivocally testified that he was not impaired in his daily life, Sanchez Dep. 133, and there is no evidence that Northwest regarded Sanchez's restrictions as limiting his ability to care for himself or others, do household chores, or perform other types of manual tasks that are centrally important to daily life. *See Philip v. Ford Motor Co.*, 328 F.3d 1020, 1025 (8th Cir.

2003) ("The type of evidence most relevant to establishing a substantial limitation in the major life activity of performing manual tasks, includes, for example, an individual's ability to do household chores, bathe, brush one's teeth, prepare meals, do laundry, etc.").

Likewise, Sanchez points to no evidence that a person with the restrictions he was (mistakenly) regarded as having would be unable to perform a broad class of jobs. Indeed, Sanchez does not identify a single job (other than Lead ESE) that these perceived restrictions would preclude him from holding — or, more importantly, a single job (other than Lead ESE) that Northwest *believed* he was precluded from holding. *Compare Conant*, 271 F.3d at 785-86 (plaintiff, who had lifting restrictions and could not repeatedly squat or bend, was not regarded as disabled where "the record is bereft of any evidence indicating that the City perceived Conant as anything more than unable to perform this particular job") *with Ollie v. Titan Tire Corp.*, 336 F.3d 680, 686-87 (8th Cir. 2003) (affirming jury award for plaintiff where plaintiff presented evidence that employer regarded him as unable to work in any warehouse or manufacturing job because all such jobs would put plaintiff in contact with dust or fumes) *and Duty v. Norton-Alcoa Proppants*, 293 F.3d 481, 491-92 (8th Cir. 2002) (affirming jury award for plaintiff where plaintiff presented evidence from a vocational consultant that he was disqualified from available jobs in his working area).[5]

Since 1994, Northwest has continuously employed Sanchez as an ESE, which is a physically demanding job. *See* Gilbertson Aff. Ex. D at 552 (Sanchez's occupation is classified as heavy); Sanchez Dep. 37-38 (testifying that not many people like working in the bag room

---

[5]*Duty* involved a state-law disability-discrimination claim, but the Eighth Circuit noted that the analysis was identical to that applicable to ADA claims. *Duty*, 293 F.3d at 490.

because it requires hard work with no breaks). Northwest also regarded Sanchez as qualified to work as a customer-service agent, as shown by Sanchez's 2005 exercise of seniority to take a customer-service position. Given this employment history, Northwest obviously regarded Sanchez as capable of performing both a heavy-duty job and a job that required continuous interaction with the public. This undermines Sanchez's claim that Northwest regarded him as substantially limited in his ability to work. *See Nuzum*, 432 F.3d at 848 ("Ability to do another job of the same general class is inconsistent with a substantial limitation on the major life activity of working."); *cf. Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516, 524-25 (1999) (affirming summary judgment for employer where it was undisputed that employee was generally employable as a mechanic and offered no evidence that he was regarded as unable to perform any mechanic job not requiring certification from the Department of Transportation).

Sanchez emphasizes that Northwest required him to undergo an accommodation assessment nearly every time he switched between Honolulu and Minneapolis. But the fact that Northwest put Sanchez through an accommodation process and granted him various accommodations does not establish that Northwest regarded him as unable to perform a broad class of jobs. *See Nyrop v. Indep. Sch. Dist. No. 11*, 616 F.3d 728, 736 (8th Cir. 2010) (school district's yearly renewal of accommodation plan and allowance of accommodations did not establish that district regarded plaintiff as disabled). There is simply no evidence that Northwest regarded Sanchez as being unable to perform a broad class of jobs — or, for that matter, *any* job other than Lead ESE.

Finally, as discussed above, there is evidence that, during the 2007 accommodation assessment, a manager in Honolulu expressed concerns to Lambert about Sanchez's mental

health.  *See* Gilbertson Aff. Ex. M.  Lambert testified, however, that he gave no consideration to those concerns, Lambert Dep. 203-04, and there is no evidence that Lambert shared those concerns with the other participants in the February 6, 2007 interactive group discussion, *cf.* Gilbertson Aff. Ex. L (group discussion notice listing physical, but not mental, impairments). Even if a reasonable jury could find that Northwest regarded Sanchez as having a mental-health problem, there is no evidence that Northwest regarded this problem as disabling, either alone or in combination with Sanchez's physical impairments.  Because no reasonable jury could find that Sanchez was disabled within the meaning of the ADA, the Court grants Northwest's motion for summary judgment.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. The motion of defendants Northwest Airlines, Inc. and Delta Air Lines, Inc. for summary judgment [Docket No. 68] is GRANTED.

2. Plaintiff's complaint [Docket No. 1] is DISMISSED WITH PREJUDICE AND ON THE MERITS.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: May  1 , 2012                              s/Patrick J. Schiltz
                                                  Patrick J. Schiltz
                                                  United States District Judge